[Civil No. 3663. Filed March 23, 1936.]

[55 Pac. (2d) 806.]

ILLINOIS BANKERS LIFE ASSOCIATION, a Corporation, and ILLINOIS BANKERS LIFE ASSURANCE COMPANY, a Corporation, Appellants, v. ANNA THEODORE, Executrix of the Last Will and Testament of the Estate of Harry B. Lagos, Deceased, Appellee.

Messrs. Moeur & Moeur, for Appellants.

Mr. V. L. Hash and Mr. L. C. McNabb, for Appellee.

LOCKWOOD, C. J.—This is the second time this case has been before us on appeal. It is an action by Anna Theodore, hereinafter called plaintiff, as executrix of the last will and testament of Harry B. Lagos, hereinafter called deceased, against Illinois Bankers Life Association, a corporation, and Illinois Bankers Life Assurance Company, a corporation, hereinafter called defendants, for the recovery of $2,500 on account of a certain life insurance policy written by

defendant Illinois Bankers Life Association, the liability on which, if any, was afterwards assumed by the Illinois Bankers Life Assurance Company.

The defense presented by the pleadings and evidence was that the policy never took effect (a) because it was not delivered to deceased while he was in good health, and (b) that its issuance and delivery were procured by false material representations made by the deceased to the medical examiner of the defendant. The representations which it is claimed were false and material were in the following questions and answers on the written application for the policy signed by deceased:

"Have you ever changed your place of residence for the purpose of benefiting your health? If so, state particulars. No.

"Have you ever had any diseases of the following named organs, or any of the following named diseases or symptoms? . . . Habitual coughing? No. . . . spitting of blood or other hemorrhage? No."

The case was tried to a jury, which returned a verdict in favor of the plaintiff, and from the judgment on the verdict and the order overruling the motion for new trial, this appeal was taken.

There are some fifteen assignments of error grouped under eight legal propositions, which we shall discuss in their order. The first raised the question of whether the court erred in overruling defendants' motion for a continuance. The facts presented in support of this motion were as follows: The original defendant in the case was the Illinois Bankers Life Association. After the first trial and appeal, the case was sent back to the superior court for a new trial, which was set for the 4th of January, 1935. After such setting, and on December 26, 1934, on motion of plaintiff the Illinois Bankers Life Assurance Company was made a party to the action. On

the next day, the attorneys who had previously represented the original defendant withdrew from the case, and immediately notified both defendants by mail of such withdrawal; their home office being in Monmouth, Illinois. On the afternoon of January 2, 1935, defendants retained the firm of Moeur & Moeur to represent them at the trial of the case, and the 3d of January, Moeur & Moeur filed a verified petition, setting forth the foregoing facts and requesting a reasonable continuance so that they might become familiar with all the facts and issues of the case. The matter came up on the morning of January 4th, and the motion for continuance was denied and defendants were compelled to go to trial immediately. While it is admitted that motions for continuance are within the discretion of the trial court, it is contended that such discretion must be exercised in a reasonable manner, and that under all of the circumstances of this case it was unreasonable to deny the continuance. A new party defendant was brought in on December 26th *upon motion of plaintiff,* and after the case had been set for trial. Immediate notice was given to the defendants by the then attorneys for the Illinois Bankers Life Association that they intended to withdraw from the case, and new counsel were employed. In view of the fact that the office of defendants was in Illinois, we think the new attorneys were secured with as much expedition as was possible. When Moeur & Moeur were retained, they had but one full working day in which to prepare for trial. We think that in the absence of a showing that the withdrawal of previous counsel was either unjustified or merely collusive for the purpose of delay, it was an abuse of discretion to deny the continuance. This conclusion is strengthened by the showing made on one

of the other assignments of error which we shall discuss further on in this opinion.

■ The second proposition is that the court erred in allowing two medical witnesses to testify as to their opinion as to when the disease from which Lagos died commenced. The questions to which objections were made were in the following language:

"Now, tell the jury, *from the history you had from him* and the knowledge that you gained by virtue of your examination and treatment, how long he had had that disease."

"Now, basing your answer on your examination of him at that time *and his history as you obtained it from him,* state whether or not, in your opinion, he was in a state of good health and physically sound on November 19, 1929." (Italics ours.)

The objection was based on the ground that it called for the opinion of an expert witness, without first setting forth the facts upon which the witness based his opinion, the particular objection being that the opinion was partially based upon the history of the case as given to the witness by the deceased. A case almost precisely in point is that of *Osborn* v. *Carey,* 24 Idaho 158, 132 Pac. 967, 969. The court said as follows:

"The history of the case was given to Drs. Cromwell and Zeller by the parents and friends of the plaintiff and was not put in evidence, and defendant could not rebut it and show that the history as given to them was not a true history of the case, provided he desired to do so. The opinions of the plaintiff's experts being thus based upon assumed facts not in evidence, such opinions have no value as proof."

The same rule is followed in *Lehigh Stone Co.* v. *Industrial Commission,* 315 Ill. 431, 146 N. E. 533. Plaintiff should have first developed the history of the case as given to the two witnesses, together with

the objective symptoms which they found on examining deceased, and their treatment of him, and after that put the hypothetical question. Since, however, it appears from the entire record that these facts were eventually presented to the jury, and since they could have been brought out on cross-examination, if this were the only error we would not reverse the case on that ground.

■■ The third legal proposition is that it was error to refuse to permit defendants' medical expert, Harry J. Felch, to answer the following questions:

"Do you know what the common practice is among doctors in examining applicants for life insurance?
"Do you know what the proper procedure is on lungs, what the proper procedure is in the medical profession in examining a man for life insurance?"

We think the court properly sustained the objection to the first question. The *common* practice of doctors in examining applicants for life insurance was not material. The *proper* practice for such examiners might, perhaps, have been, but the transcript shows that the court, after considering the question, offered to permit the witness to testify as to what was the proper and accepted medical rule in such cases, but defendants' counsel did not seek to press the inquiry along that line. There is no merit in the assignments grouped under legal proposition number three.

■ The fourth proposition is that the court erred in refusing to allow defendants to refresh the recollection of a certain witness by means of the transcript of his testimony at the former trial. That transcript shows that this witness had then testified to a very material fact in support of defendants' theory of the case at the former trial. On the second trial it appeared that he had recently accepted employment from plaintiff's attorney and that his memory, for

some reason, had completely failed as to the vital points of his previous testimony. There was some discussion as to whether, under such circumstances, he could be impeached as a hostile witness; but counsel for defendants finally disavowed any intention of doing this and merely attempted to refresh his memory by reading from the transcript of his previous testimony. The court would not allow the specific questions and answers contained in the transcript to be read to the witness, but permitted him to take the transcript himself and examine it for the purpose of refreshing his memory, excusing him from the witness-stand temporarily for this purpose. However, counsel for defendants did not see fit to recall him after he had had this opportunity. We think there was no error in the court's ruling so far as the particular matter was concerned. This incident, however, does have a bearing on the effect of the refusal of the court to grant a continuance. When counsel for defendants began to cross-examine him, objection was made and the trial judge stated from the bench that the witness could not be cross-examined nor impeached as a hostile witness because counsel for defendants had not questioned him before they placed him on the stand. Their reply was that they had been forced into trial so soon that they had had no opportunity to question the witnesses and had been compelled to rely upon the transcript of the evidence at the previous trial and, therefore, were entitled to assume that that would obviate the necessity of questioning the witness. Had they assigned error on the refusal of the trial court to permit them to treat the witness as a hostile one, we would have been compelled to sustain the assignment.

The fifth proposition is that when defendants offered to read into the record the testimony given

by one of the witnesses at the previous trial, the court erroneously permitted counsel for plaintiff to read to the jury many questions which were asked of the witness at the previous trial, but were not answered because objections thereto were sustained by the court. Section 4415, Revised Code of 1928, reads as follows:

"Transcript of testimony may be read when witness dies or is absent. Whenever in any court of record the testimony of any witness in any civil action shall be phonographically reported by an official court reporter and certified by him to be correct, and thereafter said witness shall die or be beyond the jurisdiction of the court in which the action is pending, and his absence is not procured by the party offering the evidence, either party may read in evidence the testimony of said witness in any subsequent trial of or proceeding had in the same action, subject only to the same objection that might be made if said witness were upon the stand and testifying in open court."

The issue is whether only questions which the witness answered may be read, or whether other questions which he was not permitted to answer may be included. The questions which were asked and to which the court sustained objections were of such a form and nature that the mere asking was bound to prejudice a jury against defendants unless the answer was different from what the form of the question implied the fact to be. Of course if as a matter of law, they were proper, their prejudicial nature did not justify the court in sustaining an objection thereto at the first trial, and it is urged that the trial judge at the second trial was not bound by the ruling of the judge at the first trial, and that he might have permitted the witness to answer if he had been present at the second trial. Even assuming that this be true, the witness was not present and did not testify,

so that we do not know what his answer would have been, and the only effect of allowing the questions to be read was to permit the jury to assume that they would have been answered in the manner indicated by the questions themselves. Such a method of influencing a jury is highly prejudicial, improper, and, we think, reversible error. We think only the questions which were answered should have been read.

The sixth proposition raises the point that the court commented upon the evidence in the presence of the jurors. This, of course, is forbidden by our Constitution. Const. Ariz., art. 6, § 12; *Reid* v. *Topper,* 32 Ariz. 381, 259 Pac. 397. There are nine instances quoted from the reporter's transcript in which it is contended the court violated this rule. Counsel for plaintiff argues that the remarks of the court while, perhaps, technically in some cases close to or even over the line of demarkation, were brought forth by the manner in which the case was presented, and under all the circumstances could not have caused the jurors to believe that the court was attempting to influence their judgment in regard to the facts of the case. We agree that some of the remarks were, perhaps, injudicious, but we also are of the opinion that they did not go to the length of being a comment upon the evidence, so as to require a reversal of the case if this were the only error found therein.

The seventh proposition raises an objection to the instructions, it being contended that the court, in effect, told the jury that in order for untrue statements in an application for life insurance to constitute a good defense to an action on a policy, it must be proven not only that they were material and false, but that they were made in bad faith and with intent to deceive. We have set forth in the previous appeal the difference between representations of opinion and

those of facts within the personal knowledge of the applicant, and have stated that in the one case misrepresentations must not only be material and false, but they must be made with intent to deceive, while in the other no intent to deceive is necessary, it being sufficient if the representations were material and, to the knowledge of the applicant, untrue. It is, of course, the rule that instructions must be considered as a whole and not piecemeal. *Macias* v. *State,* 39 Ariz. 303, 6 Pac. (2d) 423. We have examined all of the instructions carefully and, applying this rule, find no fault therein. The trial court very carefully distinguished between the two classes of representations, using in many cases the exact language of this court in the opinion on the previous trial. We think the law was fairly and carefully stated therein.

We come now to the eighth proposition of law presenting the most serious question in the case, which is whether the evidence sustains the verdict. The three alleged misrepresentations of fact upon which defendants rely to sustain their contention in this respect are negative answers to three questions in the application for the policy on which this suit is based. The first question was: "Have you ever changed your place of residence for the purpose of benefiting your health; if so, state particulars?" The second and third were: "Have you ever had any diseases of the following named organs, or any of the following named diseases or symptoms, . . . (a) habitual coughing, . . . (b) spitting blood or other hemorrhage?" So far as change of residence and spitting blood are concerned, we have stated on the previous appeal that they were obviously and necessarily material questions of fact within the knowledge of the applicant, and that a false answer to either of these was sufficient to void the policy. The question

of habitual coughing was not discussed in the first case, so we have not expressly passed upon that. What is meant by the phrase "habitual coughing" as used in the ordinary insurance application? Questions of this nature are propounded to laymen and not to medical experts, and it is but fair to assume that they will be taken, and are meant to be taken, in the popular and not in the technical sense. The word "habitual" is defined as "customary, usual, of the nature of a habit." Its synonyms are "customary, common, regular," while its antonyms are "unusual, unwonted, extraordinary, rare." New International Dictionary (2d ed.). And this is the sense in which the word is undoubtedly understood by the ordinary man when any act is referred to as "habitual." It is also true that since part of the question refers to certain specified diseases and symptoms that he would naturally presume the question to be whether the cough was habitual and of such a nature as might be a symptom of one of the diseases named. We must, therefore, assume that when an applicant is asked whether he has ever had "habitual coughing" he will understand the question to refer to a cough which is habitual in the meaning of the foregoing definition, and which might reasonably be a symptom of one of the named diseases. This, however, does not mean that the disease must *actually* exist, nor even that the applicant *believes* it to exist, for in such case the question would be unnecessary. The obvious purpose of inquiring in regard to a cough is the same as inquiring in regard to the spitting of blood, to wit, to give the insurer notice of an applicant's condition so that it may, if it desires, make a further and more detailed examination to satisfy itself as to whether the symptom is actually attributable to one of the named diseases, or, as it

well may be, only a symptom of a much lesser and insignificant trouble.

The exact place where the dividing line is to be drawn between a cough which is "habitual" and one which is merely sporadic cannot always be stated as a matter of law. It is frequently a mixed question of law and fact. But there are undoubtedly certain extremes when, from the facts as shown by the evidence, the court can and should say, as a matter of law based on such facts, that the cough so shown either is or is not habitual. As illustrations, if the facts showed that the applicant had been known to give a single slight cough at intervals of three or four days, as a matter of law the court should hold that it was not habitual. On the other hand, if the coughing was so continuous and insistent that the applicant was confined to his bed on account of the physical exhaustion caused thereby over a considerable period of time, it would clearly, as a matter of law, be classed as habitual. With this definition and explanation of what is meant in the eyes of the law by "habitual coughing," let us consider the evidence in regard to the three questions involved in this case. First, as to the spitting of blood: At the first trial of the case, two witnesses testified distinctly and positively that they had seen the deceased spit blood. Their testimony was not contradicted by any witness who was present at the particular times and places to which the first witnesses testified, and there was nothing intrinsic in the evidence itself nor extrinsic in the circumstances of the case which would cast suspicion thereon. On the other hand, at the second trial, one of the witnesses, in effect, said that he did not remember anything about the incidents to which he had testified at the previous trial. The other repeated his testimony, but in rebuttal the plaintiff

produced a witness who testified to certain circumstances which certainly would justify the jury in disregarding the testimony of defendants' witness as to the spitting of blood. We think that so far as this question is concerned, the matter was clearly one for the jury.

 We come next to the change of residence in regard to health. The first witness was the landlord of the deceased from October, 1928, to September, 1929, one Hale. He testified that deceased had told him he was advised to come to Arizona by a doctor in Carlton, Nevada. Strimberis, a fellow countryman of deceased, stated that deceased had told him some time in the fall of 1928 that he had come to Arizona for his health. There was no direct evidence contradicting the testimony of these witnesses, and there was nothing in the record to show that they had any interest in the outcome of the case, nor any circumstances that would tend to cast suspicion on their evidence. To meet this, plaintiff offered the testimony of other witnesses who said that deceased had told them he came to Arizona for business purposes, and that he appeared in good health. We think that this would leave the question of whether or not deceased had answered truly in regard to his change of residence a question for the jury.

 We consider, then, the evidence in regard to habitual coughing. The first witness for the defendants on this point was the landlord of deceased, above referred to. He testified in substance:

"Well, sometimes he would cough a couple of hours at a time in the morning when he would come from work. . . . It was pretty frequent towards the last couple of months he was there, the spells were protracted. I asked him to leave my place, one of the reasons being that his continual coughing annoyed the other tenants."

The witness Roseland had roomed at the lodging-house above referred to when deceased was there; he testified that he heard the latter coughing very hard almost every night when they were there, some of the spells lasting for as much as half an hour at a time, and that deceased told him the reason for the cough was that he was suffering from some kind of bronchial trouble. The witness Kartus testified that during the summer and early fall of 1929 deceased had frequent spells of coughing which made it difficult for him to get his breath, sometimes lasting for several minutes, although sometimes they would be shorter. The witness Chartier testified that at one time he saw deceased having a coughing spell over a sewer, and he looked so weak that witness went over and helped him back to the sidewalk where he could sit down. None of these witnesses were impeached nor in any way discredited, and there is nothing intrinsic in the evidence nor extrinsic in the circumstances of the case which would tend to cast any suspicion on their testimony. To meet this evidence, plaintiff produced several witnesses who had known deceased during the period referred to by the witnesses for the defendants, who said that they had never seen him coughing, and that he seemed in good health. We are of the opinion that if the witnesses Hale, Roseland, Chartier and Kartus are to be believed, coughing of the nature of and to the extent described by them unquestionably falls within the definition of habitual coughing, and that deceased must have known, as a reasonable man, that it was habitual and such as might reasonably be a symptom of either tubercular or bronchial disease. It is urged by counsel for plaintiff that coughing, even of the nature described by these witnesses, may at times be produced by a comparatively harmless cause, such

as excessive smoking or a minor weakness of the throat and that, therefore, the answer falls within the category of matters of opinion, where it is necessary that bad faith on the part of the applicant should be shown, and not matters of fact, where bad faith and intent to deceive are immaterial. We think counsel entirely misapprehends the nature and purpose of the question and of our ruling on the first appeal. It is not contended by defendants that habitual coughing is, *of itself,* a disease. The reason why the question is asked is not to ascertain the opinion or knowledge of the applicant in regard to the existence of any particular disease, but to reveal the facts to the insurer so that it, knowing their existence, may form an opinion in regard to the existence of the disease by a more careful examination of the applicant. Such being the purpose of and justification for the question, it is immaterial whether the applicant *believes* that he has or has not any particular disease or whether he actually has it. If the coughing is of such a nature that it *might* reasonably be a symptom of one of the named diseases, the insurer is entitled to know the fact for its own protection. We are of the opinion that it was not necessary for the defendants to show that the deceased either knew or believed that his habitual cough was caused by one of the named diseases. It was sufficient to void the policy if he knew the cough was habitual in its nature, and so knowing, failed to reveal its existence in his application.

The last question before us is whether the negative testimony of the witnesses who said they did not hear the deceased cough may be considered a contradiction of those who testified positively that he did. We went into this question quite thoroughly on the first appeal of this case, and held that negative testimony

of the type referred to could not be taken as a contradiction of unimpeached, undiscredited and positive testimony. We see no reason for changing our previous ruling on this point. Such being the case, we are compelled to hold that the implied finding of the jury that deceased did not have a habitual cough before he signed his application which was, of course, necessary in order to sustain a verdict in favor of plaintiff, was not sustained by the evidence. This disposes of all the questions raised on this appeal.

Because of the refusal of the court to grant a reasonable continuance, and because of its admitting before the jury questions asked of a witness at the previous trial of the case, which were not answered by him, and because the evidence does not sustain the vitally necessary finding that the deceased did not answer falsely the question in his application in regard to habitual coughing, the judgment is reversed and the case remanded for a new trial.

McALISTER and ROSS, JJ., concur.