303 P.2d 706

Chauncy O. STANBERRY, Appellant,

v.

Ruth Ida STANBERRY, Appellee.

No. 6226.

Supreme Court of Arizona.

Nov. 20, 1956.

Westover, Mansfield, Westover & Copple, Yuma, for appellant.

Rolle, Jones & Pace, Yuma, for appellee.

STRUCKMEYER, Justice.

This action was commenced by Ruth Ida Stanberry against her husband, Chauncy O. Stanberry, for a divorce, division of the community property, custody of two minor children and their support. From an order awarding custody of the children to Mrs. Stanberry this appeal has been perfected.

Since the principal questions here presented involve the sufficiency of the evidence to sustain an award of the custody of the children to Mrs. Stanberry, a somewhat lengthy examination of the transcript of the proceedings in the lower court is necessary. However, certain preliminary observations should be first made: (1) In awarding the custody of a minor, the trial court is to be guided by the best interests of the child and its decision will not be altered unless it clearly appears that there was an abuse of discretion. Grimditch v. Grimditch, 71 Ariz. 198, 225 P.2d 489, rehearing 71 Ariz. 237, 226 P.2d 142. (2) Because no findings of fact appear in the

record, the presumption is that the court found every fact necessary to support the judgment; and such presumptive finding must be sustained if the evidence on any reasonable construction justifies it. Porter v. Porter, 67 Ariz. 273, 195 P.2d 132.

Appellant's evidence strongly suggests that for many years Mrs. Stanberry has suffered from a mental condition which caused her to act in an erratic manner to the extent of requiring hospitalization and preventing her from caring for home and children; that, while she was not actively psychotic at the time of the trial, she was subjected to episodical attacks possibly on a two-year basis, and that, in the future, further periods of hospitalization could be expected; that appellee's illness was characteristic of one type of manic-depressive psychosis with a possibility of suicide and unintentional homicide.

The evidence of the mental condition of Mrs. Stanberry is extensive. It includes not only the evidence submitted at the trial of the case, but that of a related cause, being a petition for letters of guardianship filed by Mr. Stanberry and resisted by Mrs. Stanberry. Since we have concluded that we cannot say that the trial court necessarily abused its discretion in awarding the children to Mrs. Stanberry, some of the evidence which may have been considered in arriving at a decision is detailed.

In December of 1937 Mrs. Stanberry, who was then 21 years of age and un-married, went on the recommendation of her private physician to the Menninger Clinic in Topeka, Kansas. At that time she became the patient of Dr. Karl Menninger who saw her every day for several weeks. Dr. Menninger testified:

"* * * we reached a conclusion rather rapidly as to what type of illness she had. * * * She had a depression which we called, officially, neurotic, to mean that it was not entirely justified by the facts in her life of which we outsiders could be aware. * * * we never did consider her psychotic. I would like to add that there are many different definitions of what psychotic means; but in all meanings of the word we never so considered her."

Dr. Menninger was also queried as to whether Mrs. Stanberry's condition reflected a "manic-depressive" type insanity, to which he answered:

"That expression appears nowhere in our records, and was not my opinion of her then or since; not my impression of a designation of her condition then or since."

Dr. Menninger later saw Mrs. Stanberry in 1941 when she stopped by to see him— apparently not in a professional capacity— at which time "everything was going fine." He next saw her in September of 1952, about which he testified:

"* * * I wouldn't say she was mentally ill. * * * I had a neurological consultation, then I sent her over to our marriage counseling division. * * * I sat right where you are sitting, and she sat in this chair, and she told me she and her husband were trying to make it, but they were both high-strung, and that they had had numerous quarrels, or frictions, and that she would over-react to those and get very mad, very sad, or something, and that she thought he was trying to do the right thing, and she believed he had that opinion of her, but they clashed, and she would get blue, and so on, and could I suggest how they could live better together, and I said I could try, but I thought that was a matter of counseling over a longer period of time, * * * and that I thought our marriage counseling department was ideal, * * *."

In response to questioning by counsel as to whether their troubles were ones which would be settled by marriage counseling rather than by psychiatric treatment, he answered:

"It would not be quite fair to say I thought they could. I would rather say I hoped they could be settled by some counseling, because what she told me about what her husband expected of her, and some of the petty things he did that irritated her, made me think that if he had any intelligence at all he could be guided to a more skillful approach to his wife. What I think I would like to emphasize was that I didn't think she had any illness that required treatment. * * *"

Dr. Menninger was then asked if based on his experience was it his opinion that the welfare of the two children would be better served by living with their mother. He answered:

"I don't want to be presumptuous and say I know the best thing to do. I think the jury and the judge in the case will have to decide that. I can say that our opinion is that it is very bad for children to be separated from a mother, even a mother who is not always stable or always well."

And in answer to the question whether that would be true in the case of Mrs. Stanberry and her children, he answered:

"Yes, sir. As I last saw her, and as I have known her for eighteen years; not as she may or may not be at the moment, because I haven't seen her."

Dr. Menninger further testified on cross-examination:

"* * * I have understood that somebody has alleged that we have made such a diagnosis. We never made such a diagnosis. I don't think now and I never have thought that she had.

anything allied to manic depressive. That doesn't mean I don't think Dr. * * * is an estimable colleague, but I just do not agree with that diagnosis. * * * There is no doubt but the way she has reacted is unquestionably related to things her husband has done which have disturbed her. Now the way he has behaved may also be partly the reaction of how she behaves, because that is the way life is. We react to each other. And she apparently has difficulty in adjusting herself to him, and perhaps vice versa, but whether that is manic depressive, or whether it is called blinkinitis, or whatever, this doesn't change the fact she can still be a good mother. Not maybe the best mother in the world, not as good a mother as if she weren't unstable; * * * I only say that two human beings living together can be mutually irritating and disturbing to an intolerable degree; but what I object to is assuming this is some kind of intrinsic evil in her, or disease in her, which will have a bad effect on children. * * * If it can be demonstrated that a bad effect on children is occurring then I would be the first to say, as I often have to, that temporarily the children have to be protected from it."

The testimony of Dr. William B. McGrath specializing in neurology and psychiatry is illustrative of Mrs. Stanberry's case. On July 26, 1955, he made a physical and psychiatric examination of Mrs. Stanberry. Ten days later at the guardianship hearing he testified:

"Q. As a result of your examination and your consultation with this particular lady did you form an opinion regarding her mental condition? A. Yes.

"Q. What was your opinion? A. I could find no evidence of a mental or nervous disorder."

And testifying in answer to the question "What is the incident of suicide or homicide in a manic state."

"In the manic state suicide would be extremely rare, perhaps less common than in a normal instance. The incident of homicide is a little higher, or the risk slightly higher.

* * * * * *

"Q. You indicated that a person of manic state, after the episode had terminated, assuming that it had been a true manic depressive state, do mothers take care of their children satisfactory? A. Outside the period of the manic state, when a person is not in the manic state, there is no reason why an individual could not take care of her children.

"Q. There are varying degrees of the manic stages? A. Yes.

"Q. How are they—in so far as behavior, how do they differ? A. In the manic phases the variation can be anywhere from a mild one that scarcely requires any treatment at all, up to a great severity where confinement is necessary."

He further testified:

"Q. Doctor with reference to Mrs. Stanberry, do you have an opinion regarding the risk of suicide or homicide in the event at some future date she might have a manic episode? A. Yes, I have.

"Q. What is that? A. The question of suicide in any future attack, if any occur, that risk is present in proneness, but the risk is almost negligibly slight. The risk of homicide in her particular proneness is almost remarkably more negligible than even the suicide risk."

He also testified:

"In a manic reaction * * *. If an individual has in his character or personality certain malicious traits, those traits would be exaggerated. In this particular case this particular patient did not disclose any hateful or cruel characteristics so that the manic reaction would not, in my opinion, bring out any such traits or bring them into such insane prominence."

He also testified:

"Q. Dr. McGrath, do you believe that Mrs. Stanberry has the present mental capacity to have the custody of her children?

\*      \*      \*      \*      \*      \*

"A. From the mental or physical standpoint, yes."

We believe that there is an irreconcilable conflict in the evidence as to the nature and extent of Mrs. Stanberry's illness and the resulting effect on her ability to care for the children and, accordingly, it is not clear to us that the trial court abused its discretion in awarding the custody of these children to their mother.

Appellant urges that the medical evidence in favor of Mrs. Stanberry was wholly negative and without probative force because the doctors who testified on her behalf did not examine or treat her during the episodes, nor did they testify that she was not afflicted with manic-depressive psychosis. While we express doubt as to appellant's conclusions in the light of Dr. Menninger's testimony, still, and irrespective, since the trial court is to be guided by the best interests of the child, the ultimate question to be determined was whether Mrs. Stanberry was so incapacitated by her illness that the children ought not be placed in her custody. On this the evidence is not wholly negative. As Dr. Menninger said:

" * * * what I object to is assuming this is some kind of intrinsic evil in her, or disease in her, which will have a bad effect on children. * * *"

Or even assuming that appellee is subject to episodes of a manic psychotic nature, as Dr. McGrath testified:

"Outside the period of the manic state, when a person is not in the manic state, there is no reason why an individual could not take care of her children."

Further error is assigned in the refusal of the trial court to admit in evidence a letter from Kirk C. Brown, a physician who treated appellee when she resided in the State of Washington some years before. This letter was written by Dr. Brown to a doctor in Yuma. Appellant argues that the letter should have been admitted in evidence because it was written in response to a telephone request by Mrs. Stanberry. The letter reads:

"Ralph T. Irwin M.D.
"Medical Center.
"Yuma Arizona.

Re :— Mrs. Chauncey Stanberry.
"Dear Doctor :— I have little to add, in way of helping the above named patient, and am writing you, only because of repeated long distance calls, requesting me to do so. The Psychitrists who have seen this patient, to me, have only added to her frustration. Her husband has borne up under a terrific beating for years. I certainly do not feel qualified to offer a 'last word' on this case, but I strongly feel that electric-shock might give her a new start, as the patient is definitely psychotic.

"Sincerely

"Kirk Brown M.D.

"Grandview Wash."

Appellant argues that it should be admitted in evidence without proof of its authenticity because it categorically falls in the same class as a letter received in due course of mail purporting to be written in answer to another letter. Without expressly ruling on appellant's contention, it is sufficient to point out that the letter would have to be excluded in any event by other applicable rules of evidence. It principally consists of opinions of the writer which must necessarily have been based upon facts not in evidence and known only to the writer. An opinion predicated on facts not in evidence is inadmissible. Illinois Bankers Life Ass'n v. Theodore, 47 Ariz. 314, 55 P.2d 806. There are other possible objections to statements in this letter but we think it unnecessary to dwell thereon further.

In the light of our often pronounced holdings that the decision of a trial court will not be disturbed unless it clearly appears

that there was an abuse of discretion and otherwise finding no prejudical error in the record as presented, it is our judgment that the order of the trial court must be affirmed and it is so ordered.

LA PRADE, C. J., and UDALL, WINDES and PHELPS, JJ., concur.