EVELYN LOUISE KESSEL

*v.*

CHARLES VAUGHAN KESSEL

(No. 9928)

Submitted on Rehearing February 3, 1948.  Decided March 16, 1948.

*Oliver D. Kessel* and *C. E. Goodwin,* for appellant.

*Robert B. Goodwin* and *W. F. Boggess,* for appellee.

Fox, Judge:

The parties to this suit were married on the 6th day of October, 1934, and, aside from several temporary separations, lived together as husband and wife, in Jackson County, until the 29th day of May, 1946, when they separated, and this suit was instituted by the wife. Her bill was filed on May 29, 1946, and process, returnable to June rules, was executed on the defendant in person.

The plaintiff's bill, filed in the Circuit Court of Jackson County, after alleging jurisdictional grounds, charges that defendant "in violation of his marriage relation and duties, has, since the intermarriage, been guilty of extreme and repeated cruelty toward her, in this, that he is a man of violent and uncertain temper, and very frequently during the past five years, has indulged in extreme sallies of passion, and used toward the plaintiff very obscene and abusive language without any provocation; that on numerous occasions, which the plaintiff is prepared to show to the court in detail, the said defendant has used to, of and concerning this plaintiff, vile and abusive epithets; that the defendant wholly without any just or reasonable cause has accused her of being an unchaste woman and used such words toward her as 'whore', 'bitch', etc.; that on several occasions the said defendant has threatened the plaintiff with bodily harm, becoming progressively more threatening and abusive so that the plaintiff is fearful that severe bodily harm might be done to her by the said defendant." The bill also charges that as a result of this, and other offenses charged, plaintiff had become highly nervous, and had been advised by her

physician that her health would become permanently impaired and harmed unless the situation was remedied. There is a further allegation that the defendant had been, and continued to be, guilty of habitual drunkenness. It is alleged in the bill that one child, Charles Vaughan Kessel, Jr., then aged five, had been born of said marriage. The prayer of the bill is that plaintiff be granted a divorce from the bonds of matrimony; that the custody of the child of said marriage be decreed to her; that she be decreed sufficient property or money for the maintenance of herself and her child; and for general relief.

The defendant filed his answer at July rules, 1946, in which there is a general denial of the allegations of plaintiff's bill, other than those pertaining to the marriage, residence, jurisdiction, and birth of the child, and in which defendant asks that the custody of the child be decreed to him. On August 5, 1946, defendant, by leave of court, filed an amended answer, in which, while denying any acts of cruelty, or habitual drunkenness, he alleges that plaintiff condoned such acts, if they ever had been committed, by returning to his home on March 3, 1946, after a separation of approximately two months prior to that date, and resuming cohabitation and marital relations with him, until on or about May 29, 1946.

On this date of the pleadings, testimony was taken. That of plaintiff is that there were several separations, prior to the final separation on May 29, 1946; that the first of such separations grew out of the following episode: The plaintiff and defendant lived in an apartment with one door, and on plaintiff's returning from a meeting of the Women's Club, at a rather late hour, defendant locked the door and plaintiff could not enter their apartment, and was compelled to spend the night at the home of a relative, one Oliver Kessel. That on another occasion, defendant locked her out of their apartment, and she went in the backway and packed her clothes and left. Subsequent to these occasions, she returned to the marital home at the pleadings of defendant and because of her child. That on another occasion defendant came home and to her

room intoxicated, and that when he left her room she closed the door after him, whereupon he came back and pushed her on the bed. This occurrence is admitted by defendant, with the explanation that he did not strike his wife, nor harm her in any way; that she had left his bed, for one in another room, and that when he came in about ten o'clock at night, and started to go into her bedroom, she slammed the door on him; and that he then shoved the door, and she, being behind the door, was pushed back a step or two. She also testified that on two occasions she was humiliated at a public gathering at a social club in Ripley; but the extent of such humiliation, as appears from her testimony, was that on one occasion defendant excused hmiself and went into another room to engage in playing a card game leaving her unattended; and the other occasion consisted of nothing more than inattention to her, which she construed as ignoring her, and subjecting her to humiliation. The only testimony in support of the charge of using obsence, vile and abusive epithets as alleged in her bill is that on one occasion when they were discussing the matter of a divorce, defendant stated that "he would get up in the courtroom and swear on oath that 'C. V.' [the child of plaintiff and defendant] was not his child." There is no evidence supporting the allegations of the bill as to the use of vile and obscene epithets toward her. The evidence clearly shows that there was considerable quarrelling and wrangling between the two; that plaintiff suspected defendant of having improper relations with other women, and carried her suspicions to the point of employing a private detective about a year before her testimony was given, at a cost of one hundred dollars, to watch defendant, in an effort to secure proof of what she suspected. There is no charge of adultery in the bill, and no attempt to prove adultery; but the suspicions of the wife no doubt account for much of the unhappiness disclosed by this record.

There is testimony relative to financial transactions between the husband and wife. Both seem to have had a desire to get ahead in the world, in a financial way, and, together, they purchased a home in Ripley, valued at five

thousand dollars, to the purchase price of which, apparently, each contributed an equal share. Some intimation that defendant was not generous in providing for his wife, is met by testimony that, for some years, the wife engaged in business on her own account, during which period she provided for her personal needs; and the further fact that, after she gave up her business, and spent her entire time in her home, she had the use of defendant's bank account and drew checks thereon at will.

The testimony on the question of habitual drunkenness of defendant, charged in the bill, to the effect that defendant frequently came home intoxicated, and plaintiff never could tell when he would come home in that condition, strongly tends to support the charge made. On the other hand, it appears from the evidence that, for more than ten years, defendant had been a trusted employee of the Chesapeake & Potomac Telephone Company, as manager in the Ripley section, whose services were considered of such value that an exemption from military and naval services was asked for him by his employer, during the late war, from which it is argued that he could not have satisfactorily performed such services for his employer, had he been addicted to the use of intoxicating liquors to the extent charged. Several reputable and disinterested persons, residing in Ripley and the surrounding section, testified to the effect that, while defendant did drink on occasion, he was in no sense controlled by the habit, and that his drinking did not interfere with his usual and ordinary work. The testimony of defendant himself is entirely frank on that point. He admits that he does at times drink, and probably on occasions becomes intoxicated; but he strenuously denies that the practice has become an habitual one.

On this evidence the Circuit Court of Jackson County granted the divorce prayed for in plaintiff's bill, awarded the custody of the child of said marriage to plaintiff, and required defendant to pay to plaintiff, for the use of herself and child, the sum of seventy-five dollars each month, until the further order of the court.

244

Upon the question of alleged cruel and inhuman treatment, we do not think the plaintiff has sustained her charge. Code, 48-2-4, as amended by Chapter 35, Acts of the Legislature, 1935, provides that: "A divorce from the bond of matrimony may be decreed: * * * (d) for cruel or inhuman treatment, or reasonable apprehension of bodily hurt, and a charge of prostitution made by the husband against the wife falsely shall be deemed cruel treatment within the meaning of this paragraph * * *."

The two instances where plaintiff was locked out of her apartment, several years prior to the institution of her suit; the instance of her being pushed on the bed; and the two instances of supposed humiliation at the social club, are not of such character as convince us that cruel or inhuman treatment, within the meaning of the statute, was inflicted. Certainly, they could not reasonably have created, in the mind of the plaintiff, any apprehension of bodily hurt. There is no sufficient showing that the health of plaintiff was in any way affected by the conduct of defendant. True, plaintiff says that, as a result of her husband's treatment, she became worried and nervous, but that is not uncommon with people, men and women, and is usually overcome without any resulting injury to health. In our opinion, to establish cruel and inhuman treatment, something more is called for under our decisions than happened between these people. They would have been easily forgiven and forgotten had there been the proper disposition on the part of each to overlook the faults and failings of the other, and to devote their energies to establishing a peaceful home for themselves and their child. Marriages should not be dissolved on such a meager showing of mistreatment. The interests of society and the welfare of the family system, forbid it.

There is no showing that plaintiff was ever charged by her husband with being a prostitute. The only statement touching upon that point is the alleged statement of defendant, which he denies, that he would go into court and testify that he was not the father of the plaintiff's child. This does not amount to a charge of prostitution. *Criser*

v. *Criser,* 109 W. Va. 696, 156 S. E. 84; *Roush* v. *Roush,* 90 W. Va. 491, 111 S. E. 334; *Schutte* v. *Schutte,* 90 W. Va. 787, 111 S. E. 840.

On the remaining allegation of habitual drunkenness, we are also of opinion that the charge has not been sustained. Admittedly, the defendant is of a convivial nature, occasionally drinks intoxicating liquor, and may at times become intoxicated. If in doing so, he must be termed an habitual drunkard, a large percentage of marriages in West Virginia, and elsewhere, would fall at the whim of either the husband or wife; because, unfortunately, a large percentage of our people, at some time, drink intoxicating liquors, and occasionaly become intoxicated. Habitual drunkenness means something more than this. One definition of an habitual drunkard is: "A person given to inebriety or the excessive use of intoxicating drink, who has lost the power or the will, by frequent indulgence, to control his appetite for it. * * * Within the meaning of the divorce laws, one who has the habit of indulging in intoxicating drinks so firmly fixed that he becomes drunk whenever the temptation is presented by his being near where liquor is sold. * * * One who has a fixed habit of frequently getting drunk." Black's Law Dictionary, Third Edition, 867. Another definition is: "* * * An irresistible habit of getting drunk, a fixed habit of drinking to excess, such frequent indulgence to excess as to show a formed habit and inability to control the appetite. * * *." Keeser on Marriage and Divorce, 3d Ed., Paragraph 407.

In 17 Am. Jur. 221, it is stated: "In jurisdictions where drunkenness and intemperance are made statutory grounds for divorce, the habit must have continued for the time specified. Occasional intoxication is not habitual drunkenness which will justify the divorce of a woman any more than the divorce of a man. To be an habitual drunkard, a person does not, however, have to be drunk all the time. One is an habitual drunkard within the meaning of the divorce laws who has a fixed habit of frequently getting drunk. It is not necessary that he should

be constantly drunk or that he should have more drunken than sober hours. It is enough if he has the habit so firmly fixed on him that he becomes drunk periodically or is unable to resist when the opportunity and temptation is presented."

The testimony does not show that defendant comes within any of the classifications of drunkenness mentioned in the quotations above. In our opinion, the evidence plainly shows that he is not an habitual drunkard within the intent and meaning of subsection (e) of Code, 48-2-4.

But even if the evidence was sufficient to sustain the charges made in the bill of cruel and inhuman treatment, we think it clearly appears that the same was condoned by plaintiff, when, after the separation of December, 1945, she returned to her husband's home on March 3, 1946, and cohabited with him and resumed marital relations in general, she condoned all acts of cruelty, if any, theretofore committed by the defendant. Code, 48-2-14, specifically provides: "Nor shall a divorce be granted for any cause when it appears that the suit has been brought by collusion, or that the offense charged has been condoned * * *." The cases bearing on condonation are, generally speaking, where adultery has been charged, but by the plain wording of the statute, condonation applies to any charge in a bill for divorce. Here, admittedly, when plaintiff returned to her husband's home on March 3, 1946, she resumed full marital relations, and, in the absence of subsequent cruel and inhuman treatment, effectively condoned all former cruel and inhuman treatment.

Of course, there was a conditional condonation. *Deusenberry* v. *Deusenberry*, 82 W. Va. 135, 95 S. E. 665. If, after her return, the husband had resumed his acts of cruelty, he could not then have relied on the condonation, and she would have been entitled to relief on account of offenses condoned in a future suit for divorce. But there is no proof of any act of cruelty after March 3, 1946, unless the alleged habitual drunkenness would be termed cruelty. We do not think we can say that habitual drunkenness

alone, if it existed, amounts to cruelty, because the statute states that as a particular ground for divorce, separate and distinct from the other grounds mentioned. However, "cruelty resulting from drunkenness is cause for divorce." *Maxwell* v. *Maxwell,* 69 W. Va. 414, 71 S. E. 571. Here, no cruelty resulting from drunkenness is shown.

On the point of habitual drunkenness, the proof shows that defendant probably continued his habits with respect to the use of intoxicating liquors after March 3, 1946; but, as stated above, we do not believe that he has ever at any time become an habitual drunkard, within the meaning of the statute mentioned above.

We therefore reverse the decree of the Circuit Court of Jackson County, remand the case to that court, with directions to deny the plaintiff a divorce from the bonds of matrimony; and, if the parties remain separated, to enter such orders or decrees as the court may deem proper, under Code, 48-2-15, respecting the care, custody, education and maintenance of the child of said marriage.

*Reversed and remanded with directions.*