[Civ. No. 21488. Second Dist., Div. One. Aug. 7, 1956.]

JACQUES DRUCKER, Respondent, v. THE STATE BOARD OF MEDICAL EXAMINERS et al., Appellants.

*Assigned by Chairman of Judicial Council.

Edmund G. Brown, Attorney General, and Dan Kaufmann, Deputy Attorney General, for Appellants.

L. R. Martineau, Jr., Glenn B. Martineau and Peart, Baraty & Hassard, and Richards, Watson, Smith & Van Petten, as Amici Curiae on behalf of Appellants.

Elconin & Elconin for Respondent.

FOURT, J.—The defendants have appealed from a judgment wherein the court issued a peremptory writ of mandate directing the Board of Medical Examiners to vacate and set aside its order of September 9, 1954, revoking respondent's license to practice as a dispensing optician, and ordering the Board to issue a dispensing optician's license to respondent (doing business as Southern California Optical Company), and to advise the court 30 days from the date of service of the writ that there was compliance.

The respondent holds a certificate from the Board of Medical Examiners (hereinafter referred to as the Board) as a registered dispensing optician. In October, 1953, an accusation was filed before the Board under the Administrative Procedure Act charging the respondent, doing business as Southern California Optical Company, with violation of section 2556 of the Business and Professions Code.*

---

*"§ 2556. Unlawful acts, practices, and advertising. It is unlawful to do any of the following: To advertise at a stipulated price or any variation of such a price or as being free, the furnishing of a lens, lenses, glasses or the frames and fittings thereof; to advertise any examination or treatment of the eyes in connection with the sale of eyeglasses, spectacles, or the parts thereof; to insert any statement in any advertising in connection with the business of dispensing optician which is false or tends to mislead the public; to make use of any advertising statement of a character tending to indicate to the public any superiority of any particular system or type of eyesight examination or treatment over that provided by other licensed ocular practitioners; to advertise the furnishing of, or to furnish, the services of a refractionist, an optometrist, a physician and surgeon; to directly or indirectly, employ or maintain on or near the premises used for ''optical dispensing, a refractionist, an optometrist, a physician and surgeon, or a practictioner of any other profession for the purpose of any examination or treatment of the eyes; or to duplicate or change lenses without a prescription or order from a person duly licensed to issue the same.''

The accusation was in four counts. Count 1 charged, in substance, that on October 18, 1952, the respondent did furnish the services of a physician, namely Dr. Maurice Sachnoff, to Harold LaMour, and on November 25, 1952, did employ and maintain Dr. Sachnoff on or near the premises which were used for optical dispensing, namely 2620 Saturn Avenue, in Huntington Park.

Count 2 charged that on March 28, 1952, respondent furnished the services of an optometrist, namely Dr. M. M. Krieger, to William P. Ingles, and further, did, about the same date, employ and maintain Dr. Krieger on or near the premises which were used for optical dispensing, namely 5319 South Hoover Street, Los Angeles.

Count 3 charged that on September 24, 1952, the respondent did furnish the services of a physician and surgeon, namely Dr. Nathaniel Berman, to Lorrean Hubbard, and further, did, about the same date, employ and maintain Dr. Berman on or near the premises which were used for optical dispensing, namely 5319 South Hoover Street, Los Angeles.

Count 4 charged that on September 24, 1952, the respondent did furnish the services of a physician and surgeon, namely Dr. Nathaniel Berman, to Hazelle D. Hotz, and did, about the same date, employ and maintain Dr. Berman on or near the premises which were used for optical dispensing, namely 5319 South Hoover Street, Los Angeles.

A hearing was held before a hearing officer of the Division of Administrative Procedure and the hearing officer rendered a proposed decision, the essence of which was that he found that the respondent had violated the provisions of section 2556 of the Business and Professions Code as charged, and recommended that respondent's license and certificate be revoked. The hearing officer's proposal was adopted by the Board on September 9, 1954.

On November 1, 1954, the respondent filed a petition for a writ of mandate in the Superior Court of Los Angeles County. An answer was filed by the Board denying generally respondent's allegations. The judge of the superior court granted the writ of mandate, ordering, as heretofore set forth, among other things, that the Board set aside its order of revocation.

Under chapter 5, part 1 of division 3 of title 2, section 11523, Government Code, it has been held that in a mandamus proceeding, where an administrative agency exercises statewide jurisdiction, the superior court, in reviewing the agency's

actions in revoking licenses, must exercise an independent judgment of the facts in addition to reviewing questions of law. (*Dare* v. *Board of Medical Examiners,* 21 Cal.2d 790 [136 P.2d 304]; *Sipper* v. *Urban,* 22 Cal.2d 138 [137 P.2d 425]; *Hohreiter* v. *Garrison,* 81 Cal.App.2d 384 [184 P.2d 323].)

The issue on this appeal is whether the court, after its independent review of the facts, was justified in determining that the evidence was insufficient to support the finding of the Board that the respondent herein employed, furnished or maintained an optometrist or physician and surgeon, in violation of the provisions of section 2556 of the Business and Professions Code.

Harold F. LaMour testified that he was an investigator for the Board and that he went to the premises at 2620 Saturn Avenue, Huntington Park, which were the premises occupied by the Southern California Optical Company, owned by the respondent. The witness stated that he entered the place about 10:30 o'clock a. m., and talked to a woman dressed in white, telling her that he needed glasses. The lady advised him that the doctor would not be in until noontime, and he informed her that he was in a hurry, to which she replied that she might be able to get the doctor there sooner. The witness then told the lady that noontime would be satisfactory, and she gave him a card of the Southern California Optical Company with its four addresses printed thereon. He inquired as to whether the doctor would be at the address of the company and was informed that he would be next door. The witness came back about 1 o'clock p. m., and was told by the woman to go next door, where, upon the window, was the name Maurice Sachnoff. Dr. Sachnoff spoke to the witness and took him down a hallway to another room, and there examined his eyes. The doctor wrote out a prescription and told him to take it next door. He was told by the doctor that the charge would be $5.00, and thereupon paid the doctor and obtained a receipt therefor. There was no receptionist at the doctor's office. The witness returned to the premises at 2620, with the prescription, and made arrangements to return for the glasses. Upon his later return, a pair of glasses were produced, which were adjusted to his ears and eyes. The witness asked for a copy of the prescription and during the conversation Dr. Sachnoff appeared and signed the

copy of the prescription. The witness paid $22.77 for the glasses.

There was testimony that the premises at 2620 Saturn were leased to Southern California Optical Company some time in the middle of 1951. The premises at 2622 were leased to Western States Optical Company on or about January 21, 1952. Both of these names were fictitious business names of respondent. Respondent requested electrical services for the premises at 2622 and was billed and paid for the same. The records of the city of Huntington Park Apartment Buildings showed that respondent applied for a certificate of occupancy for the premises at 2622, and in accordance with the procedure of the city, the occupancy permit was forwarded to the License Tax Department of the city clerk's office, and in the course of the procedure, respondent told the city clerk, in substance, that a doctor would occupy the premises. The respondent admitted leasing the adjoining store and stated that in the first instance he desired the premises for manufacturing purposes in connection with his dispensing business. He further stated that the premises were not leased to Dr. Sachnoff until September 1, 1952, and that prior to that date, he had attempted to rent it to a general practitioner.

William P. Ingles testified that he was a state inspector for the Department of Professional and Vocational Standards Bureau of Furniture and Bedding Inspection, and that he visited the offices of Southern California Optical Company at 5319 South Hoover Street. He stated that he first called the optical company about getting some glasses and was told, in substance, that he should have a prescription, and further that they could arrange to have an examination made and then could fill the prescription and sell him glasses. He stated that he was told that that could be done right there. He further stated that he inquired as to the cost and was told that the examination fee would be $5.00 for a doctor who would be supplied by the company. He thereupon made an appointment for the following afternoon. He further testified that he entered at about 2 o'clock p. m., March 28, 1952, and stated that his name was Ingles. He was told that Dr. Krieger was not in as yet, but was expected at any moment. Later he was informed that the doctor was available and was shown the stairway to the doctor's office. In the upstairs portion of the building he saw a glass door with the name of Dr. Gottschalk, M. D. on it, and entered the room and there found Dr. Krieger who gave him an eye examination. On completion of

the examination the doctor gave the witness a prescription for glasses. Ingles paid the doctor $5.00. On the next day Ingles called Southern California Optical Company and inquired about getting glasses and told them he had had no examination. A male voice answered the telephone and indicated that they would take care of that for him through a Dr. Schwartz of Beverly Hills, who would charge him $5.00.

Dr. Krieger testified that he never maintained an office at 5317½ South Hoover Street, the address of the upstairs portion of the building; that he was employed full-time as an optometrist at 842 South Broadway and was so employed on the date in question. He stated that he went to the address of 5317½ South Hoover Street to do eye examinations and was aware that Southern California Optical Company had its offices in the same building on the ground floor. He further testified that he would go to this address at specified times and care for appointments which were generally made for him during the time that he had arranged to be there.

The employees of Southern California Optical Company made the appointments for him. Dr. Krieger had made arrangements to use these premises in June or July, 1951. Drucker had asked him if he would care to do refractions and he had stated that he guessed he would as this was a way to make some extra money. Drucker knew that Dr. Krieger was employed full-time and also knew that he was to be at the office at 5317½ South Hoover Street when he was not working for his full-time employer. Drucker asked him about his fee and when Dr. Krieger said that it was $5.00, this seemed to be satisfactory. Occasionally he would call the offices of Southern California Optical Company to find out if they had any appointments for him because if there were none he did not make the trip. He did not pay any rent for the premises or any utilities. However, he did have several conversations with Drucker about payment of the rent, but he consistently refused to pay and the arrangements continued despite his refusal to pay. The doctor brought his own diagnostic instruments to the address.

Lorrean Hubbard and Hazelle Hotz, employed by various boards of the Department of Professional and Vocational Standards on a part-time basis as investigators, testified that on September 22, 1952, they proceeded to the premises of Southern California Optical Company at 5317 South Hoover Street. There Mrs. Hubbard asked a Mr. Bruton if this were the office that examined and made glasses for people working

in the industrial plants, and he said that it was the place. She asked for Dr. Krieger and was informed that he was at St. Vincent's Hospital in surgery; that he was usually in the office on Tuesday, from noon until 9 in the evening, but that his schedule was full for the following Tuesday. She was further informed that they had several other doctors and mentioned a Dr. Berman who would be available on the Wednesday following. Inquiries were made as to the charges for the examination and she was told that the fee would be $5.00. The ladies returned on Wednesday to the offices of the Southern California Optical Company and were told by the man to go upstairs, that Dr. Berman was there. He showed them the stairway leading to the upstairs and they proceeded to the doctor's room. The doctor examined the eyes of both of them and they each paid him $5.00. The doctor told them to take the prescriptions downstairs and get their glasses.

Dr. Berman testified that he was an M.D. and that his office was located at 8820 Wilshire Boulevard; that he started going to the premises at 5317½ South Hoover Street in about 1950. He had made arrangements with Dr. Gottschalk to go there once or twice a week, and paid $10 a month toward payment of the rent. When Dr. Gottschalk left he took over the place and did not know to whom to pay the rent. He then had talk with the respondent and agreed to pay him the $10 because he didn't want to occupy the whole floor. He stated that during the period that he was seeing patients at 5317½ South Hoover Street he received requests from Southern California Optical Company for examinations or for appointments. He further stated that he never paid the respondent or any representative of Southern California Optical Company for rendering the service to him of receiving calls or making of any appointments.

All of the fees charged by the various doctors to whom persons desiring eye examinations were referred were retained by such physicians, and the fees for their services were never at any time divided with respondent or any of his employees. Respondent never attempted to exercise any control over any doctor and at no time did the respondent, or any of his employees, ever seek to interfere with or exercise any influence over any doctor in the manner in which they conducted their examinations, the fees they charged their patients, or the professional relationship between the doctor and the patient. All doctors to whom persons were referred for eye examina-

tions supplied their own diagnostic equipment and instruments, and none of the same was furnished by the respondent herein, or his employees.

The evidence further indicated that it was a widespread, if not universal practice for dispensing opticians to recommend doctors to those desiring glasses who had no prescriptions; that it was the optometrist or physician or surgeon who furnished the services to those needing the glasses and not the dispensing opticians.

The appellants contend that the trial court took an improper approach to the matter in that he indicated that because of the penal nature or serious consequences of the proceedings under the statute, it must be strictly construed.

The law is settled that due process of law requires that all statutes defining criminal offenses must specifically describe the conduct which is forbidden and must fix an ascertainable standard of guilt. The terms of such statute must be sufficiently definite so that men of common intelligence will not have to guess at its meaning and will not differ as to its application. It was said in *Connally* v. *General Const. Co.,* 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322, 328-329]:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law. . . .

. . . . . . . . . . . .

" ' . . . The dividing line between what is lawful and unlawful can not be left to conjecture. The citizens can not be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. *Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that*

*the citizen may act upon the one conception of its require-*
*ments and the courts upon another!'* " (Emphasis added.)

In *Lanzetta* v. *New Jersey,* 306 U.S. 451 [59 S.Ct. 618, 83
L.Ed. 888], at page 890 [83 L.Ed.], the court said:

". . . No one may be required at peril of life, liberty or
property to speculate as to the meaning of penal statutes.
All are entitled to be informed as to what the State com-
mands or forbids. . . ."

These same rules have been made applicable to administra-
tive regulations which impose criminal penalties. In *M. Kraus
& Bros.* v. *United States,* 327 U.S. 614 [66 S.Ct. 705, 90 L.Ed.
894, 898-899], it was said:

". . . Hence to these provisions must be applied the same
strict rule of construction that is applied to statutes defining
criminal action. In other words, the Administrator's pro-
visions must be explicit and unambiguous in order to sustain
a criminal prosecution; they must adequately inform those
who are subject to their terms what conduct will be considered
evasive so as to bring the criminal penalties of the Act into
operation. See *United States* v. *Wiltberger,* 5 Wheat. (U.S.)
76, 94-96 [5 L.Ed. 37, 42, 43]. The dividing line between
unlawful evasion and lawful action cannot be left to conjec-
ture. The elements of evasive conduct should be so clearly
expressed by the Administrator that the ordinary person can
know in advance how to avoid an unlawful course of action."

The key words of the statute in question, so far as this case
is concerned, are "furnish," "employ," and "maintain."
Taking first the word furnish, at the time of the criminal
prosecution of this matter it was contended by counsel for
the prosecution that "mere recommending" constituted a
violation of this section. However, at the time of the hearing,
before the hearing officer appointed by the Board, it was
stipulated by counsel for the appellant Board that to merely
recommend a nearby physician does not constitute a violation
of the section in question. The recommendation of a physician
by a dispensing optician either is, or is not, a violation of the
law. However, the act does not state whether recommending
a physician does or does not constitute furnishing, or whether
it is lawful or unlawful.

Black's Law Dictionary, third edition, page 830, defines
"furnish" as "To supply; provide; provide for use; deliver,
whether gratuitously or otherwise." The trial judge
stated with reference to the matter of "furnish," as follows:

"The next [issue] is the furnishing, and furnish, as I have

indicated is to supply, provide for use, delivery, whether gratuitously or otherwise. What is it that they must furnish? There are services that they must furnish; furnish the services of a refractionist, an optometrist, a physician and surgeon. If a mere recommendation or referral could be deemed to be furnishing these services, then, of course, any of these companies which recommended or referred any prospective patient to a doctor would be in violation of the law, but this, of course, is not the purpose of this section.

"In other words, anything short of providing them with those services in addition to recommending or referring would not come within the terms of the statutes in my opinion. In other words, a reasonable interpretation of the word 'furnish' would be that you were providing those services either gratuitous or for a fee, but that fee was yours and not someone else's. A man is not practicing law when he refers a man to a lawyer, but if he takes a fee for legal work, he is stepping across the boundary, the same as a man who takes a fee for doctor's services when he is not a doctor. He might be stepping across the boundary, but there isn't anything here to indicate that these people didn't get those services directly from these physicians and paid these physicians directly for them, and no part of it went to the other people. Of course, it was to their advantage to have a doctor near or next door, but did the legislature intend to make it a crime for any of these companies to encourage a doctor or a refractionist or optometrist to set up shop in the immediate vicinity. If they had intended to make that the law, it should have been spelled out far more definitely than it is here. It appears to me that the mere recommendation or referral cannot be deemed to come within the term 'furnish,' when the fee was paid to the doctor, and the full fee was paid to the doctor, even though as an accommodation, either to the prospective customer or to the doctor some appointments may be made. That, however, would not come within the term 'furnish.' "

The word "employ" is defined in Black's Law Dictionary, *supra*, p. 657, as follows: "To engage in one's service; to use as an agent or substitute in transacting business; to commission and intrust with the management of one's affairs; and, when used in respect to a servant or hired laborer, the term is equivalent to hiring, which implies a request and a contract for a compensation, and has but this one meaning when used in the ordinary affairs and business of life."

Appellants contend that the word "employ" should be defined as it is set forth in Webster's New International Dictionary, namely, "To make use; to make use of the services of." Appellants further contend that it was never the legislative intention to limit the prohibited activity to a master-servant relationship.

Referring to the trial court's memorandum opinion, in reference to the matter of "employ," the court said,

"The Court is using Black's Legal Dictionary for it seems unreasonable to suppose that a definition of terms not found in a reputable legal dictionary should be the basis for determining violation of a quasi-criminal statute. In simple language, the word 'employ' is synonymous with 'hire' in ordinary parlance, and as said in Black's Dictionary, it has 'this one meaning when used in the ordinary affairs and business of life.' The record is devoid of any evidence whatsoever that the petitioner employed any optometrist or any physician or surgeon in connection with his business. All fees for their services were collected and retained by the optometrist and physicians and surgeons. The failure of the evidence to sustain the accusation that the petitioner employed optometrists and physicians and surgeons is so obvious as to need no further comment."

The basic aim of all of the statutes enacted with reference to this subject matter having to do with prohibiting the employment of optometrists and ophthalmologists by lay persons or corporations is the elimination of the chance of dominion of the professional decisions of the practitioner by commercial interest. However, courts have refused to interfere with honest business arrangements in the absence of lay control of professional practice or lay disturbance of professional relationships. In the case of *State ex rel. Bierring* v. *Ritholz*, 226 Iowa 70 [283 N.W. 268, 121 A.L.R. 1450], wherein the court was confronted with a situation similar in many respects to the present case, the court said (at p. 271 [283 N.W.]):

"This court has repeatedly held that the test of the employer-employee relation is the right of the employer to exercise control of the details and method of performing the work. We find that the defendants under the arrangement did not have the right to control or seek to control examinations of eyes by the physicians. The physicians, all of whom had practiced optometry prior to the arrangement, were not performing the business of defendants but were carrying on their

own business of optometry under a reciprocal arrangement with the defendants for the mutual financial benefit of both parties. When a patient came to consult one of these physicians there was the personal relationship of patient and physician between them. The physicians, in making the refraction, represented the patient and not the defendants.''

 The respondent here never paid nor guaranteed to pay any salary to any doctor or optometrist. There was never any allegation or proof that the respondent ever attempted to influence or exercise any control whatsoever over any doctor. In fact, appellants' evidence showed the exact contrary.

Next dealing with the word ''maintain,'' Black's Law Dictionary (*supra*, p. 1143) defines the word as ''To keep up, preserve, bear the cost of, keep unimpaired, keep in good order, repair. . . . To Support; to supply with means of support; provide for; sustain.'' The trial judge's memorandum opinion with reference to this subject sets forth the following:

''As shown by the previous statement of facts, various optometrists and physicians and surgeons rented premises from the petitioner, but the conduct of their businesses, which were near but not in the petitioner's place of business, were all reached by a separate entrance. All of these paid rent to the petitioner, except one doctor who owed rent but refused to pay it.

''It is sought to show that by the furnishing of electricity, water and other facilities the petitioner maintained these optometrists and physicians and surgeons. But the water, gas and electricity were usual services which are furnished with leased premises and these premises were all leased from the petitioner. There is some contention on the part of the Attorney General that there is no evidence of a lease, but the Attorney General appeared to be referring to a written lease and there was none, but the premises were leased under parol leases, which is an accepted manner of leasing.

''If subleasing premises separate from those used by petitioner is sought to be prohibited by use of the word 'maintain,' it is not encompassed within the ordinary and usual meaning of the term. Referring to the case of *MacQ. Williamson, Attorney General of the State of Oklahoma et al.* v. *Lee Optical of Oklahoma, Inc.* [348 U.S. 483 (75 S.Ct. 461, 99 L.Ed. 563, 573-574)], submitted to the Court by the Attorney General [appellant here], the statute there specifically prohibits

leasing as follows under Section 4 of the Oklahoma Act which reads as follows:

. " 'No person, firm or corporation engaged in the business of retailing merchandise to the general public shall rent space, sublease departments or otherwise permit any person purporting to do eye examination or visual care to occupy space in such retail store.'

"If the word 'maintain' in connection with the statute under consideration can be stretched to cover subleasing of premises near but not in the premises occupied by an optical dispenser, then the meaning of the term would be so vague and indefinite as to render the statute unconstitutional. However, the reasonable meaning of the word 'maintain' in this connection would not cover subleasing of separate premises to an optometrist or physician or surgeon by an optical dispenser.

"The evidence fails to sustain the accusation that the petitioner either furnished, employed or maintained optometrists or physicians and surgeons in contravention of the law, when such terms are used in their ordinary and usual meaning to which they are restricted in a statute in this sort."

The judge obviously believed some of the testimony of some of the witnesses and he apparently disbelieved some of the other testimony. That was his province to do so.

We are of the opinion that the trial judge was well within his authority, based upon the record in this case, to hold as he did.

The judgment and order are, and each is, affirmed.

White, P. J., and Doran, J., concurred.

A petition for a rehearing was denied September 4, 1956, and appellants' petition for a hearing by the Supreme Court was denied October 4, 1956.