[Civ. No. 6042. Fourth Dist. May 9, 1960.]

MILTON S. McMURTRY, Appellant, v. STATE BOARD OF MEDICAL EXAMINERS, Respondent.

*Assigned by Chairman of Judicial Council.

Burke & LaRue and Oren, McCartney, Sells & Edman for Appellant.

Stanley Mosk, Attorney General, E. G. Funke, Assistant Attorney General, and W. B. Thayer, Deputy Attorney General, for Respondent.

COUGHLIN, J.—This is an appeal from the judgment in a mandamus proceeding affirming an order of the respondent, Board of Medical Examiners, revoking the certificate of petitioner, Milton S. McMurtry, to practice medicine.

Petitioner was charged with unprofessional conduct in three counts, i.e., (1) failing to report certain named habitual users of narcotics as required by section 11425 of the Health and Safety Code; (2) failing to make and keep records of the dispensation of narcotics as required by section 11225 of that code; and (3) prescribing narcotics for and furnishing narcotics to certain named persons who were addicts and who were not under his treatment for a pathology or condition other than narcotic addiction, in violation of sections 11163 and 11164 of the Health and Safety Code. Under the provisions of the Business and Professions Code, violations of the aforesaid sections of the Health and Safety Code constitute unprofessional conduct authorizing the suspension or revocation of a certificate to practice medicine. (Bus. & Prof. Code, §§ 2361, 2391, 2391.5.) After a hearing, as prescribed by law, the Board of Medical Examiners found the charges contained in counts 1 and 2 to be true; found the charges contained in count 3 to be untrue; and revoked petitioner's certificate to practice medicine in the State of California. Thereupon these proceedings in mandamus were instituted to review the aforesaid order pursuant to section 1094.5 of the Code of Civil Procedure. The matter was heard upon a transcript of the proceedings before the Board of Medical Examiners including the evidence produced, the findings made and the order entered thereon.

Petitioner, a licensed medical doctor, prescribed narcotics for three of his patients who were named in the foregoing accusations, between April 12, 1954, and April 19, 1956. To the first of such, a man, prescriptions were given over a period

of two years on 48 separate occasions; to the second, a woman, prescriptions were given over a five-month period on 24 separate occasions; and to the third, another man, prescriptions were given over a period of four months on 33 separate occasions. The issuance of these prescriptions was established through a reporting system which requires a person filling the same to send a copy thereof to the State Division of Narcotic Enforcement. The last of these prescriptions was issued to each of these patients shortly before petitioner voluntarily surrendered his narcotics license on April 19, 1956. During the time the three named patients were treated by petitioner they had a pathology necessitating the use of narcotics to relieve them from pain. The first was suffering from a kidney condition; the second patient was suffering from a kidney infection; and the third patient was a victim of cancer, which claimed his life on August 30, 1957.

The board found that neither of these patients was an addict but that each of them was an habitual user of narcotics within the meaning of section 11425 of the Health and Safety Code, which requires a physician prescribing a narcotic to an habitual user to report that fact to the State Division of Narcotic Enforcement. Previous to the treatment by petitioner, the second patient had been reported as an habitual user by one doctor and the third patient had been reported as an habitual user by 15 doctors. It is not disputed that petitioner did not report either of these three patients as an habitual user.

Section 11425 of the Health and Safety Code provides: "A physician prescribing or furnishing a narcotic to an habitual user shall within five days after first prescribing or furnishing the narcotic personally report in writing by registered mail, over his signature, to the State Division.

"*The report shall contain* all of the following:

 (a) Name of the patient.
 (b) Address of patient.
 (c) Character of the injury or ailment.
 (d) Quantity and kind of narcotic used.
 (e) A statement as to whether or not the patient is an addict."

The trial court found: (1) "That the decision of the Board of Medical Examiners of the State of California in this matter is supported by the findings of the Board; that the findings

of the Board are supported by the weight of the evidence";
and also (2) that "Respondent"—undoubtedly meaning "pe-
titioner"—prescribed narcotics to the three named persons
"who were then and there habitual users of narcotics" and
did not report the information required by the aforesaid code
section, including a statement as to whether or not they were
addicts.

Petitioner contends that section 11425 of the Health and
Safety Code is unconstitutional and void because the obliga-
tion imposed thereby is not defined with certainty; that the
phrase "habitual user" is vague, indefinite and uncertain; and
that any proceeding to revoke his license which is based on an
alleged violation of the aforesaid code section does not comply
with the requirements of due process of law.

██ It is well settled that "a statute which either forbids
or requires the doing of an act in terms so vague that men of
common intelligence must necessarily guess at its meaning
and differ as to its application violates the first essential of
due process of law." (*Connally* v. *General Const. Co.*, 269
U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322]; *People* v. *McCaughan*,
49 Cal.2d 409, 414 [317 P.2d 974]; *In re Newbern*, 53 Cal.2d
786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) ██ This
principle applies not only to statutes of a penal nature but
also to those prescribing a standard of conduct which is the
subject of administrative regulation. (*Hewitt* v. *State Board
of Medical Examiners*, 148 Cal. 590 [84 P. 39, 113 Am.St.Rep.
315, 7 Ann.Cas. 750, 3 L.R.A. N.S. 896]; *In re Peppers*, 189
Cal. 682 [209 P. 896]; *Drucker* v. *State Board of Medical
Examiners*, 143 Cal.App.2d 702 [300 P.2d 197].) ██ The
language used in such legislation "must be definite enough
to provide a standard of conduct" for those whose activities
are prescribed as well as a standard by which the agencies
called upon to apply it can ascertain compliance therewith.
(*People* v. *McCaughan*, 49 Cal.2d 409, 414 [317 P.2d 974].)
██ Approved rules by which to judge the sufficiency of a
statute in the premises have been applied in numerous deci-
sions, i.e., the words used in the statute should be "well
enough known to enable those persons within its purview to
understand and correctly apply them." (*People* v. *Nunn*, 46
Cal.2d 460, 467 [296 P.2d 813]); ██ words of long usage, or
which have an established or ascertainable meaning in the
profession or industry involved, or those which have been
given a definite and restrictive interpretation by the courts,
or the meaning of which may be determined from a fund of

human knowledge and experience, will meet the test of certainty. (*In re Newbern*, 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116] ; *People* v. *McCaughan*, 49 Cal.2d 409, 414 [317 P.2d 974] ; *People* v. *Building Maintenance etc. Assn.*, 41 Cal.2d 719, 725 [264 P.2d 31] ; *In re Leach*, 215 Cal. 536, 545 [12 P.2d 3] ) ; ██ if the words used may be made reasonably certain by reference to the common law, to the legislative history of the statute involved, or to the purpose of that statute, the legislation will be sustained (*In re Newbern*, 53 Cal.2d 786, 793 [3 Cal.Rptr. 364, 350 P.2d 116] ; *People* v. *McCaughan*, 49 Cal.2d 409, 414 [317 P.2d 974] ; *Orloff* v. *Los Angeles Turf Club*, 36 Cal.2d 734, 740 [227 P.2d 449] ) ; ██ and a standard fixed by language which is reasonably certain, judged by the foregoing rules, meets the test of due process ''notwithstanding an element of degree in the definition as to which estimates might differ. (*Connally* v. *General Const. Co.*, 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322] ; *Lorenson* v. *Superior Court*, 35 Cal.2d 49, 60 [216 P.2d 859].) ██ A prohibitory statute will be upheld even though the acts which it prohibits are defined in vague terms, ''if it requires an adequately defined specific intent.'' (*People* v. *McCaughan*, 49 Cal.2d 409, 414 [317 P.2d 974].)

██ The phrase ''habitual user'' as applied in the statute under consideration without doubt refers to an ''habitual user of narcotics.'' ██ The term ''habitual,'' especially when referring to the use of drugs, involves the concept of habit. In Webster's International Dictionary, second edition, unabridged, ''habitual'' is defined as follows: ''Of the nature of a habit; according to habit; established by, or repeated by force of, habit . . . Doing, practicing, or acting in some manner by force of habit.''

In that same work the term ''habit'' is defined as: ''An aptitude or inclination for some action, acquired by frequent repetition and showing itself in increased facility of performance or in decreased power of resistance; as, the opium habit.''

A medical dictionary defines ''habit'' as: ''The result of an impulse passing through a certain set of neurons, then synapses many times; a motor pattern executed with facility because of constant repetitions. . . . Habit, words pert. to: . . . addict, addiction state . . .'';

And defines ''habituation'' as an ''act of becoming accustomed to anything from frequent use.'' (Taber's Cyclopedic Medical Dictionary, revised sixth edition.)

 The substance of many definitional decisions on the subject is that an act which is done habitually is an act which is done as a result of habit. (*Mahone* v. *Mahone*, 19 Cal. 626, 628 [81 Am.Dec. 91] ; *Illinois Bankers Life Ass'n* v. *Theodore*, 47 Ariz. 314 [55 P.2d 806, 811] ; *Ring* v. *Ring*, 112 Ga. 854 [38 S.E. 330, 332] ; *Blunk* v. *Blunk*, 327 Ill.App. 666 [64 N.E. 2d 787] ; *Short* v. *Morrison*, 159 La. 193 [105 So. 286, 288] ; *McLanahan* v. *McLanahan*, 104 Tenn. 217 [56 S.W. 858, 861] ; *Moore* v. *State*, 111 Tex.Crim. 461 [14 S.W.2d 1041] ; *Kennedy* v. *State*, 150 Tex.Crim. 25 [200 S.W.2d 400, 404] ; *Kessel* v. *Kessel*, 131 W. Va. 239 [46 S.E.2d 792, 796] ; *Moering* v. *Falk Co.*, 155 Wis. 192 [144 N.W. 207, 208].)

Bearing the aforesaid meaning the phrase ''habitual user of narcotics'' connotes a narcotic addict; identifies a reasonably definite state of narcotic use; prescribes a standard readily understandable by persons to whom the regulation is directed; and, judged by the rules heretofore noted, is not vague, indefinite or uncertain.

 However, respondent contends that the term habitual as used in the statute under consideration has a broader meaning; is not limited to the concept of habit; but includes also the concept of ''frequent or oft-repeated'' use. This contention is born of necessity because of the facts in this case and the consideration which must be given to all of the provisions of the statute regulating narcotics. The board found that the three patients for whom petitioner prescribed a narcotic, without reporting their status as habitual users, were not addicts. The findings of the trial court approved this factual determination of the board. The code section in question makes an obvious distinction between the meaning to be given to the term ''habitual user'' and that to be given the term ''addict,'' as those terms are used therein, by requiring a physician furnishing a narcotic to an ''habitual user'' to include in his report of that fact a further statement as to whether or not the patient, i.e., the ''habitual user,'' is an ''addict.'' (Health & Saf. Code, § 11425.) Elsewhere in the statute there are specific references to and provisions respecting narcotic addicts. It is provided that no person shall prescribe or administer a narcotic to an addict except as permitted by the code. (Health & Saf. Code, § 11164.) The method and place of treatment of addicts for addiction is set forth in detail (Health & Saf. Code, §§ 11390-11394), including the filing of a written report by the physician administer-

ing the treatment. (Health & Saf. Code, § 11395.) It is a criminal offense to "unlawfully use or be *addicted* to the unlawful use of narcotics." (Health & Saf. Code, § 11721.) (Emphasis added.)

The code provisions which place persons addicted to the use of narcotics in one class and persons habitually using narcotics in another class require a differentiation in definition of the terms used to identify the two classes.

The dictionary definition of the terms "addict," "to addict," "addicted" and "addiction" are as follows: An addict is "one who is addicted to a habit, esp. to the habit of taking of some drug . . ."; "to addict" means "to apply habitually; to give one's self up and over to as a constant practice; to devote; habituate"; "addicted," when used in a bad sense, "refers to one who is given up or strongly disposed to some taste, practice or pursuit"; and "addiction" means "state of being addicted; also, habituation, esp. to drugs." (Webster's New International Dictionary, second edition, unabridged.) The medical dictionary heretofore considered defines "addict" as "1. To form a habit for the use of a drug. 2. One habituated to the use of a drug"; and defines "addiction" as "Enslavement to some habit, esp. the drug habit. . . . A condition in which cessation of narcotic or other drug produces definite 'symptoms of abstinence.'" (Taber's Cyclopedic Medical Dictionary, revised sixth edition.) The Welfare and Institutions Code defines a "narcotic drug addict" within the meaning of the condition there under consideration as "any person who habitually takes or otherwise uses to the extent of having lost the power of self-control . . . any . . . narcotic drug . . ." (Welf. & Inst. Code, § 5350.) ▮ From the foregoing discussion it is apparent that a definition of the terms "addict" and "addicted" as used in the Health and Safety Code, intrinsically involve the concept of habit; of a compulsive factor which directs the action of the addict; of a repetitious use of narcotics resulting in a condition which destroys the power of self-control and creates a need therefor which may be satisfied only by a continued use thereof. ▮ On the other hand, it has been declared that the dictionary definition of the term "habitual" involves the concept of habit *and* frequency of action. (*In re Newbern*, 53 Cal.2d 786, 794 [3 Cal.Rptr. 364, 350 P.2d 116].) ▮ As a consequence, an observance of the statutory distinction be-

tween an "addict" and an "habitual user" compels the conclusion that the characteristics attributable to habit which are present in the addict need not be present in the habitual user, and that a definition of the latter term does not require the necessary inclusion of these characteristics, but carries the broader criterion of frequent use without the necessity of addiction. This conclusion is in accord with respondent's contention.

However, such a definition of the term "habitual user" lacks that certainty of standard required of a regulatory statute. (*In re Newbern*, 53 Cal.2d 786 [3 Cal.Rptr. 364, 350 P.2d 116] ; *People* v. *McCaughan*, 49 Cal.2d 409 [317 P.2d 974] ; *Orloff* v. *Los Angeles Turf Club*, 36 Cal.2d 734 [227 P.2d 449] ; *In re Peppers*, 189 Cal. 682 [209 P. 896] ; *Hewitt* v. *State Board of Medical Examiners*, 148 Cal. 590 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann.Cas. 750, 3 L.R.A. N.S. 896] ; *People* v. *Pace*, 73 Cal.App. 548 [238 P. 1089].) The requirement that a physician shall report the giving of a narcotic prescription to a person who frequently uses narcotics gives the physician no reasonable standard for compliance. There is no criterion by which the physician can determine how many instances of narcotics use must transpire before a patient becomes a frequent user. His decision in the premises is subject to review by a board, which, likewise has no gauge by which to determine compliance or noncompliance with the statute. In *Hewitt* v. *State Board of Medical Examiners*, 148 Cal. 590, 594 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann.Cas. 750, 3 L.R.A. N.S. 896], the court, in considering the validity of a statute providing that "all advertising of medical business in which grossly improper statements are made" constituted unprofessional conduct, annulled an order revoking a physician's license to practice because she had engaged in unprofessional conduct within the given definition, and made the following statement which is pertinent to the case at bar :

"If, in the opinion of the board, the statement is 'grossly improbable,' the certificate to practice is to be revoked. The right of the physician to be secure in his privilege of practicing his profession is thus made to depend not upon any definition which the law furnishes him as to what shall constitute 'grossly improbable statements,' but upon the determination of the board after the statement is made and simply upon its opinion of its improbability. No definite standard is furnished by the law under this provision whereby a physician with any

safety can advertise his medical business; nor is there any definite rule declared whereby after such advertisement is had the board of medical examiners shall be controlled in determining its probability or improbability. The physician is not advised what statements he may make which will not be deemed 'grossly improbable' by the board. No rule is provided whereby he can tell whether the publication he makes will bring him within the ban of the provision or not. The advertisement in connection with his medical business may be made in entirely good faith; the statement may be of such a character that it involves no moral delinquency on the part of the physician, nor in any degree tends to deceive or injure the public. These matters, however, have no controlling effect. If in the judgment of the board, such statements are 'grossly improbable' the right to practice is forfeited. Instead of furnishing some standard by which the physician can determine in advance what statements shall be treated as 'grossly improbable,' some definition of that term which will be a protection to him in his legal right to advertise his business, the statute, as far as his action is concerned, leaves that matter at large, but provides that after he has made the advertisement an *ex post facto* judgment of the board shall determine whether his statement is 'grossly improbable' or not . . .

(P. 595) : ''The right which a person possesses under the constitution and the laws to practice his profession as a physician and surgeon cannot be made to depend upon a provision of a statute as vague, uncertain, and indefinite as is the provision we have been considering. If a physician's license is to be revoked for 'grossly improbable statements'; if he is to be thereby deprived of his means of livelihood, of his right to practice a profession which it has taken him years of study and a large expenditure of money to qualify himself for, on the ground that he has made 'grossly improbable statements' in advertising his medical business—it is requisite that the statute authorizing such revocation define what shall constitute such statements so that the physician may know in advance the penalty he incurs in making them. It is an easy matter for the legislature to declare what statements in the advertisement of medical business shall be deemed 'grossly improbable,' and it must do so, and not leave it to a board of medical examiners after the publication is made to determine in its judgment whether the statements were or were not 'grossly improbable,' and according to its particular view

of the matter revoke or refuse to revoke the license. The right to practice medicine cannot be made to depend upon such a vague, uncertain, and indefinite provision.''

The purpose of the statute affords no standard by which to determine the status of a patient as an habitual user within the contended applicable meaning of that term, i.e., a frequent user. ██ From a thorough study of all of the statutory provisions on the subject, it is fairly obvious that the purpose of section 11425 is to furnish the Division of Narcotic Enforcement with information that will give it a double check on prospective as well as active addicts, and on the unlawful use or dispensation of narcotics. ██ However, the ascertainment of this purpose furnishes no definitional guide by which to determine the frequency of use information desired. The lawful use of narcotics is limited to the treatment of patients suffering from a disease, ailment, injury, or infirmity attendant upon old age, and to those suffering from narcotic addiction. (Health & Saf. Code, § 11330.) Strict adherence to this objective is policed through a detailed prescription and reporting system. Compliance with this system furnishes a record adequately supplying the information basic to the opinion required of the administering physician by the regulation contained in section 11425. The treatment to be administered an addict for his addiction is specifically prescribed by the statute; limitations by standards fixing both time and amount of use are invoked. (Health & Saf. Code, §§ 11392, 11394.) The precision and detail generally evident in the regulatory and enforcement provisions of the statute magnify the uncertainty prevalent in the requirement that a practitioner should apply a personal standard in determining the status of a patient as a frequent user of narcotics with the hope that the standard fixed by him will be acceptable to the medical board sitting in judgment on his professional conduct.

As heretofore noted, the technical meaning of the term ''habitual,'' i.e., the meaning ordinarily attributable to the term by the medical profession in characterizing a user of narcotics, has been ascribed and limited to the term ''addict'' by the statute. Therefore, this professional or technical meaning is of no assistance in fixing a standard by which to measure compliance with the requirement of section 11425.

It is apparent that the patient referred to in section 11425 as an habitual user may be either a person who uses narcotics frequently and has become an addict, or a person who uses

narcotics frequently but is not addicted. Within the meaning of the statute the term "addict" includes an habitual user, but the term "habitual user" does not include an addict. ▇▇▇ To the extent that the statute requires the physician to report respecting an habitual user who is an addict, it is valid and enforceable. The standard for determining addiction is sufficiently certain to meet the requirements of due process.

The board determined that petitioner was guilty of unprofessional conduct in failing to make the report outlined by section 11425 respecting his patients who, it found, were habitual users of narcotics but not addicts. Its decision in this regard was based on an alleged violation of the unconstitutional phase of the statute; was not supported by the findings; and, therefore, constituted an abuse of discretion. (Code Civ. Proc., § 1094.5, subd. (b).)

Respondent contends, however, that the judgment of the trial court should be sustained upon the ground that it was required to make an independent finding on the evidence; that the evidence did support a finding that the three patients in question were addicts; and the finding that these patients were habitual users should be sustained on the basis that they were habitual users who were addicts. Assuming for the sake of argument only the validity of the premise that every inquiry pursuant to section 1094.5 of the Code of Civil Procedure constitutes a trial de novo, and assuming further that the evidence is sufficient to support a finding that the three patients were addicts, a patent fallacy in respondent's contention is that the trial court found that the three patients were not addicts. This conclusion necessarily follows from the acceptance by that court of the finding of the board which, as heretofore noted, specifically determined that these patients were not addicts. As a consequence, the decision of the trial court in the premises cannot be sustained.

This conclusion renders unnecessary a further interpretation of section 11425 which, on its face, appears to impose upon a physician the absolute obligation of determining whether his patient is an habitual user within five days after first prescribing for or furnishing a narcotic to such patient. The reporting requirement of this code section is imposed on the physician without regard to his knowledge that his patient is an habitual user. As written, the statute apparently requires the physician to file a report based on the fact and not upon his knowledge of the fact that the patient he is treating

is an habitual user. Unless the apparent effect of this statute be changed by interpretation, a physician who fails to make the required report within five days after first prescribing or furnishing a narcotic to his patient may be guilty of unprofessional conduct if the patient at that time, in fact, was an habitual user, even though the physician had no knowledge of that fact. A query respecting the necessity of knowledge as basic to the violation of a similar statute was raised but not settled in *People* v. *Braddock,* 41 Cal.2d 794, 800 [264 P.2d 521].

As to the second charge of unprofessional conduct which the trial court and the board found to be true, i.e., failure to make and keep a record of narcotics dispensed, petitioner contends that the evidence is not sufficient to sustain the finding.

When the sufficiency of the evidence to sustain a finding is challenged on an appeal from a judgment in a mandamus proceeding to review an order of the State Board of Medical Examiners, the appellate court is obliged to accept as true that evidence, including the inferences which reasonably may be drawn from the testimony, which will support the finding and to reject the evidence which will support a contrary finding. (*Moran* v. *Board of Medical Examiners,* 32 Cal.2d 301, 308 [196 P.2d 20] ; *cf. Tringham* v. *State Board of Education,* 50 Cal.2d 507 [326 P.2d 850] ; *Backman* v. *State,* 167 Cal.App.2d 82, 87 [333 P.2d 830] ; *Sautter* v. *Contractors' State License Board,* 124 Cal.App.2d 149 [268 P.2d 139].) A statement of the facts herein must abide the foregoing rule.

The trial court found that on numerous occasions between August 5, 1955, and April 20, 1956, petitioner administered and dispensed approximately 53 vials of demerol containing 30 c.c. thereof in each vial, without making a record of such dispensation as required by law. Section 11225 of the Health and Safety Code requires every person who administers or dispenses a narcotic to make a record respecting the transaction which will show the name and address of the patient; the date; the character and quantity of the narcotic involved; and the pathology and purpose for which it was administered or dispensed. During the period in question petitioner received a total of 132 vials of demerol, each vial having a 30 c.c. capacity. This fact was substantiated by referring to three federal purchase order forms issued in connection therewith which were dated respectively, August

5, 1955, February 1, 1956, and March 5, 1956. On April 20, 1956, only 52 of these vials of demerol remained, leaving 80 vials to be accounted for. Petitioner told an inspector from the State Bureau of Narcotic Enforcement that he had given these narcotics to patients who needed them but that he had no record of such dispensations. Thereafter the inspector suggested that in view of petitioner's failure to comply with the law, he should surrender his narcotics license, to which petitioner agreed, simultaneously signing a letter which stated:

"As evidence of my good faith, to be given consideration in connection with such action as may be contemplated for my failure to comply with Section(s) 11,163, 11,225, 11,226 and 11,227 of the Health and Safety Code of the State of California, I hereby voluntarily surrender my narcotic tax stamp. . . ."

Although not charged against him as a violation of code requirements, the evidence showed that petitioner failed to make a record of prescriptions issued after December 31, 1955, on behalf of one of the three patients heretofore referred to as habitual users. ▉▉▉ Evidence of a characteristic business pattern is a circumstance which may be considered in connection with the charge under consideration. (*People* v. *Cavanaugh,* 44 Cal.2d 252, 265 [282 P.2d 53].) Records on the remaining two patients were not made up until after the narcotic inspector had interviewed petitioner concerning his failure in this regard. Petitioner claimed that 27 vials were stolen from him. Although equivocal, and shown to be contradictory, his testimony in this regard was accepted by the trial court. Nevertheless, 53 of the 132 vials received by him were unaccounted for. The trial court concluded that these 53 vials were dispensed by him. This was an inference reasonably drawn from the evidence and is corroborated by admissions made by the petitioner to the inspector and other incriminating circumstances. ▉▉▉ Circumstantial evidence is sufficient to support a finding of the trial court. (*H. A. S. Loan Service, Inc.* v. *McColgan,* 21 Cal. 2d 518, 523 [133 P.2d 391, 145 A.L.R. 349]; *Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.,* 19 Cal.2d 622, 629 [122 P.2d 570, 141 A.L.R. 798]; *Haworth* v. *Eliott,* 67 Cal.App.2d 77, 80 [153 P.2d 804].) No record was made of these dispensations.

▉▉▉ The contention of petitioner that the evidence does not support a conclusion that the 53 vials were dispensed by him because he testified that he did not dispense them; be-

cause his admissions were the result of misunderstanding or ignorance on his part; and because there existed the opportunity that they may have been stolen is based merely on a conflict in the evidence which does not control the decision of this court. (*Moran* v. *Board of Medical Examiners, supra,* 32 Cal.2d 301; *Barsha* v. *Metro-Goldwyn-Mayer,* 32 Cal.App. 2d 556, 561 [90 P.2d 371]; *Sorel* v. *Smith,* 99 Cal.App.2d 266 [221 P.2d 115]; *Blue* v. *Watson,* 147 Cal.App.2d 582 [305 P.2d 911]; *Beach* v. *Contractors State License Board,* 151 Cal.App.2d 117 [311 P.2d 51].) The contention of petitioner with respect to the second count in the accusation against him is without merit.

The foregoing conclusion renders unnecessary any discussion of further points raised by petitioner.

In ordering that petitioner's certificate should be revoked, the board considered not only its decision that the accusations of unprofessional conduct as set forth in counts 1 and 2 were true, but also the fact that on a prior occasion petitioner's certificate had been revoked because of violations of law constituting unprofessional conduct, i.e., procuring criminal abortions. As heretofore indicated, the finding of the board did not support the charge of unprofessional conduct based on a violation of section 11425 of the Health and Safety Code. ▮▮▮ The matter of fixing the penalty for unprofessional conduct lies within the discretion of the Board of Medical Examiners. (*Nardoni* v. *McConnell,* 48 Cal.2d 500, 506 [310 P.2d 644].) ▮▮▮ Whether the penalty of revocation should be invoked under the circumstances for petitioner's unprofessional conduct arising out of a violation of section 11225 of the Health and Safety Code is a matter for decision by that board. (*Cooper* v. *State Board of Medical Examiners,* 35 Cal. 2d 242, 252 [217 P.2d 630, 18 A.L.R.2d 593]; *Garfield* v. *State Board of Medical Examiners,* 99 Cal.App.2d 219, 231 [221 P.2d 705].)

The judgment is reversed and the trial court is directed to enter judgment commanding respondent board to set aside its order of revocation and directing that board to reconsider the case and thereafter make such order as it deems proper in the light of this court's opinion and judgment.

Griffin, P. J., concurred.

A petition for a rehearing was denied May 27, 1960, and respondent's petition for a hearing by the Supreme Court was denied July 6, 1960.